We have five cases to be submitted today on oral argument. We will take at least one recess and maybe two during the argument before hearing the last case, and we begin with United States v. Daniel. Ms. Keller. May it please the Court. My name is Kim Keller. I am here today on behalf of Defendant Andrews. Ms. Andrews was convicted on five counts of marriage fraud and other fraud-related activities. There were no drug counts that took place within this case. She was sentenced to 24 months' imprisonment. She's been released, but her appeal is not moot because the term and the issue that was raised in her appeal relates to a condition of supervised release. The special condition that's being challenged by Ms. Andrews is special condition number four, and that is the provision that requires that she not knowingly purchase, possess, distribute, administer, or otherwise use a psychoactive substance. This was not objected to in the district court. No, Your Honor, this was not objected to. It is being subjected to the plain error standard of review. The reason that Ms. Andrews believes this Court should find there to be plain error in this case is a threefold argument. The first is when you look at the burden imposed by this overly broad and vague term, the burden on Ms. Andrews and on the probation officer is too much to satisfy the normal conditions that are looked at when looking at whether a condition of supervised release is closely tailored to the policy reasons behind supervised release conditions. The burden on Ms. Andrews to find a legal job as a convicted felon with a fraud conviction, and this is her sixth conviction, so we're talking about a career criminal trying to find a legal job. And remember, that is one of the policy reasons behind conditions of supervised release, help these individuals integrate back into society. She originally had a job as an Aramark cashier. Now that is not something that she could necessarily obtain a job at because psychoactive substances, when you look into scientific journals, could be things, and case law and the Seventh Circuit has written quite broadly on the term psychoactive substance when used in conditions of supervised release. Back to the trial itself, to the sentencing, what was the role of this condition at that time? I'm sorry, could you repeat that? There was no objection made. I'm driving at it. Why not? I'm not sure, Your Honor. I was not the trial lawyer. I know you weren't, but someone was. Yes. You come here and say this is plain error. That, by indirection, is saying that the counsel was unaffected, or perhaps not legally so, but was certainly asleep, or something's wrong with it. If it's that plain, the lawyer should have objected, right? I think the lawyer should have objected, but I can give what I think is the reason why there may not have been an objection. Judge Posner wrote in United States v. Siegel about how at sentencing hearings, trial lawyers and criminal defendants are focused more broadly on the terms of imprisonment, how long the term of imprisonment was, and perhaps restitution and things like that. Most folks don't think that part of it. What does the ESR say about this? Anything? No. There's nothing in the Fifth Circuit on psychoactive substances. There's nothing in the PSR in this case about conditions? About — I'm sorry, Your Honor. I'm having a hard time hearing you. I need to get a little closer. Is there nothing in the PSR about this condition you complain of? There is. There are four terms that are couched together, all under substance abuse. In every case? Yes. Yes. And so the lawyer knows, and the PSR has been the central document in sentencing for many, many years. Every lawyer walking in a courtroom knows that, right? Who was the defense lawyer? I mean, I don't mean personally, but was he a public defender or hired counsel or what? I believe it was a private, a CJA-appointed lawyer, Your Honor. I don't know how long the psychoactive substances term has been used. I don't — you know, we have substance abuse terms that you see. I'm not talking about this particular one. I'm saying that the conditions have been in the PSR for years and years, probably longer than that lawyer was at the bar, or at least a substantial part of it. So every lawyer knows that that's the place to go to know the terms and conditions. Now, you're suggesting that there may be some tactical reason why the lawyer doesn't want to talk about that and talk about it later. But plain error doctrine won't allow that kind of a mindset. Yeah. And I don't — I'm not suggesting there's a tactical reason. I'm suggesting there's an excuse for why it wasn't thought of as deeply and as intensively as we're thinking about it now. How do you think more broadly? You think so broadly you don't read the PSR? Well, the objection that was made and the focus by the trial lawyer at the sentencing hearing was on the enhancement for being an organizer or a leader. I understand that. But you don't get — you just want another hearing. So I wasn't concerned about that one. Now you want to hear another one. I don't follow that. Well, sometimes trial lawyers make — and Your Honor knows this — make tactical decisions on focusing the court's attention on what he thinks is the strongest issue. Tactical decision sounds like waiver. I understand, Your Honor. But this Court does allow for plain error review for reasons such as this. And the reason I think this would fall under plain error review is because of the longstanding implications of a term like this. I'm sorry, but how do we in plain error review a tactical decision not to object? Well, and don't let me mislead the Court. I am not here on an ineffective assistance of counsel claim. What I am here on is a plain error review despite the failure to object on this condition infringing on the personal liberties of Ms. Andrews now that she's out trying to get a job when she cannot touch or be around a psychoactive substance. Scientific journals have stated that psychoactive substances include coffee, sugar, cigarettes, things that are not illegal. What I'm suggesting this Court do is send guidance to the trial courts, to the district courts, that better language could be used for these conditions such as illegal psychoactive substances, mood-altering psychoactive substances. All right. Your initial time has expired, Ms. Keller. You've saved one minute for rebuttal. Ms. Rowe. May it please the Court, Carmen Rowe for Justice Daniel. Justice Daniel's right to present a defense and call witnesses was violated in this trial when the trial court denied his motion for severance in a case of marriage fraud where he could not compel the testimony of his co-defendant who was also his wife. As you know, we almost never reverse on denial of motion for severance because of the general rule that defendants indicted together get tried together. That's almost impossible for you to overcome, and I just don't see where you're anywhere near that in this case. Well, Your Honor, with all due respect, there is at least one case from this Court, called Tifford v. Wainwright, which I would point to, that gives some support for our argument today. This case is unique from many of the other cases that you look to in as much as we have a constitutional right, which is that specific risk that we would look for, that high standard and prejudice that needs to be shown in these cases. I would also refer this Court to the holding in Byrd where the United States— How were you injured by the common trial here? I'm sorry? How were you injured by the denial of severance here? Yes, Your Honor, specifically because Mr. Daniel was unable to call as a witness his wife in a marriage fraud claim where he proffered an affidavit to suggest that she would explain to the jury their relationship, how they met, and that it was, in fact, a non-fraudulent lawful marriage. Because he was unable to compel her testimony in this particular case because, as my colleague has suggested, she's a career criminal. She had a significant criminal history. He could not compel her to testify, and she was not willing to testify, as she attests to in her affidavit, because of her significant criminal history. By definition, that's true in most of Your Honor's cases. Most of the defendant's cases, you'd face the same difficulties if you wanted to compel the testimony of your co-defendant. Well, in this specific case, they put forward two affidavits, one from Mr. Daniel as well as one from Ms. Andrews, and made the showing that this court required an Owens. All four factors were met. Additionally, we would also have to show specific and compelling prejudice, and it would be our contention that we've done that by pointing to a constitutional right to present a defense and to offer witnesses, which Mr. Daniel was effectively denied the right to do in this particular case. And in response, the government suggests that he should make a choice between his right to Fifth Amendment silence, said another way that he should testify if he can't compel Ms. Andrews to testify, or be prevented from effectively presenting the defense that he wanted to at trial. The case law in this area, as this Court says, is difficult to overcome, but I would suggest that our case is distinguishable inasmuch as it identifies a clear constitutional right which meets that high standard. Cases like Byrd as well as Tifford v. Wainwright support this contention. Specifically, I would also point this Court's attention to Zaffiro v. United States, where they talked about this type of risk meeting this standard way back in the 80s when this severance law started, and they specifically said such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a co-defendant. For example, evidence of a co-defendant's wrongdoing in some circumstances erroneously could lead a jury to conclude a defendant was guilty. I would submit to this Court that what Zaffiro was concerned about, what they suggested should warrant a severance, is exactly what we're presenting here with Mr. Daniels' case. I'll reserve the rest of my time for rebuttal. Thank you. You're citing us to cases that aren't even in your brief, some of them. Yes, Your Honor. All right. You've saved time for rebuttal. Thank you. Thank you. Mr. Frizzell? May it please the Court. John Frizzell for Mr. Alabi. We've raised two issues before this Court, the first being the sufficiency of the evidence to convict Mr. Alabi. Basically, the argument is that the evidence was insufficient to show his knowledge of the co-defendant, the conspirator's intent to violate the immigration laws at the time they entered the marriage. And second issue is the district judge's overruling of the requested charge to instruct the jury that the defendant had to have knowledge and intent that the conspirators had the intent to violate the immigration laws at the moment they entered the marriage. I'll start with the requested charge. The government's case here, the evidence they rested on was the testimony of Gables, for the most part, who had a lot of credibility issues, and her testimony was not corroborated. But the government also relied upon immigration officials who testified about several red flags that they looked for as indicative of marriage fraud. These things that they looked for and that they found in this case and pointed to in this case all occurred after the marriage. There were documents that were filed, things like that, and evidence of not living together, things that showed that the marriage wasn't legitimate. But there was no factual basis to infer from those facts Mr. Alabi's knowledge at the time they entered the marriage. So the instruction requested by the defense would have focused the jury's attention on the fact that they had to focus on the intent at the moment that people entered the marriage. Well, counsel, it seems to me that the instruction, not in the words that you wanted, did tell the jurors, first, that knowingly, gave a definition to the jurors of knowingly, means that the act was done voluntarily, intentionally, and not accidentally. Second, that the defendant knew the unlawful purpose of the agreement to enter into the marriage and that the marriage was knowingly entered for the purpose of evading immigration laws. If the marriage was entered into for that purpose, it seems to me the purpose, knowingly, the purpose of that had to exist when the marriage was entered into. So it seems to me that these principles were covered by the jury instructions given by the judge. I'm not saying there's anything erroneous about your instructions, but they do seem duplicative of what the jury was told. Well, here, if the issue was the intent of the two people who got married, then it would be distinguishable from the case we have here, where the uncorroborated evidence from Ms. Gable was that Mr. Olabi was the person who brought the Nigerian to Ms. Gable. And that the marriage was entered into with the intent to violate the immigration laws because of all the testimony from the agents about what they look for as indicative of marriage fraud, which was all post-marriage conduct, that's not giving the motion to clarify that you have to focus on the defendant's intent at the moment of the marriage because that's when this offense ends. It's a non-continuing offense. It's complete upon entrance of the marriage. And in general, that instruction was correct, but here where Mr. Olabi's, even through the uncorroborated testimony, ended, if that testimony was believed, if his involvement ended at that moment, but much of the evidence that was entered other than Ms. Gable's testimony was the agent's, and that was a big focus of why these were fraudulent marriages, it leads to the potential of confusion of the issues for the jury. In the unique circumstances presented here, if it had been a general, you know, normal case, I understand. But here where there was only one witness whose credibility was suspect and who there was no corroboration of that testimony and the government's then talking a lot about this post-marriage conduct, in this case, I think it would have helped the jury focus the jury's attention on that essential element. And I'll leave the remainder of my time. Yes, you've saved me the rebuttal. Ms. Wilson. May it please the Court. Andrews has failed to establish reversible plain error in conjunction with the special condition in the judgment. The special condition was recommended in the PSR, as Judge Higginbotham pointed out. Judge Rosenthal then read the special condition at the sentencing hearing. That was the time to object, whether Andrews wanted to oppose it or sought clarification. The special condition was justified based on paragraph 64 in the PSR, as well as the probation officer's comment in the special condition. And that was, Andrews had a history of drug abuse. She said that she had been smoking marijuana since I think it was the age of 17, two or three cigarettes a day until 2015. And that's approximately 20 years, actually just shy of that. She also told the probation officer that she wanted to stop. And in conjunction with the dispute over this special condition, the psychoactive substances, the probation officer and subsequently the judge imposed in the judgment that Andrews get drug abuse treatment, that she be tested. And she's not opposing any of that. The psychoactive substances is not that far removed from the illegal drugs as we know them. And, in fact, it gives the example of synthetic marijuana and bath salts. Andrews can also ask the probation officer if she needs clarification. I think an element of common sense needs to be imposed in relation to the Southern District's order, namely that the examples of coffee, getting the jitters from coffee or sugar highs, don't make sense. There's a common sense component here that they're looking at noncontrolled substances that affect people's minds or physical attributes. Has this language been considered by this court before? It does seem potentially overbroad, common sense may well limit it. But has this language itself been circulating for a while or where does it come from? I think we're seeing it more and there was a Southern District order I've cited in my brief. I forget when it was imposed. I want to say 2017. I'm not entirely certain. Do you fully embrace this? Is this the kind . . . you're in a position, at least in the district court, to maybe give some advice to the district judge about this sort of language. Is this thing going to not be better written? Well, first of all, I want to be clear that it's a recommendation in the order, or that's not even correct, that it's up to the judge's discretion. In other words, it doesn't have to be imposed. But secondly, to the extent that this court believes that there's some guidance needed, this isn't the case because it's under plain error of view. And also, the way that the order is written and, therefore, the special condition, the judgment that Judge Rosenthal chose to follow is that if, to the extent there is some clarification needed, it actually talks about prior approval of the probation officer. So while, whether or not the court thinks that some guidance is needed, I'm not certain that this is the case based on the procedural posture here. And because of that same procedural posture, it makes it even harder to reach the fourth, even assuming the court finds that the first three prongs were met, it makes it even harder to reach the fourth prong where there's a modifiable condition. It's not dispositive, but the court can go back and change it, which makes it harder, as I said, under the fourth prong. In relation to the denial of the motion for severance, Judge Smith, of course, you're correct, that that's an extremely high burden here. And it's even stronger in conspiracy cases because you run the risk of duplicative trials and disparity in sentencing. And what Judge Rosenthal found here is that the evidence, if you will, that was offered in the affidavits was duplicative. And it was about the relationship, where they supposedly met, how they supposedly dated and fell in love. And what Judge Rosenthal found is that the substantially identical facts would, even if the court granted the motion to severance, Daniel would not be deprived of any evidence because the facts were virtually identical. And secondly, the court thought that the government might try to go ahead, if Andrews were to testify and offer the drug evidence, and the court would instruct against it, limiting the jury, this is what you can consider, only against that particular defendant and whatnot. And the court, of course, did that in these instructions anyway. These instructions are very, very strong in what the jury can consider. The court was very clear that the evidence had to be limited to a particular defendant and that the jury could not indict or, excuse me, couldn't convict one defendant based on the evidence, you know, that another defendant had pleaded guilty or anything like that. So the court's instructions definitely protected against any prejudice. And, of course, this court presumes that juries follow their instructions and are capable of segregating the evidence. And so the court's decision was correct and especially based on judicial economy. Turning to Mr. Alabi, he was critical to the success of the conspiracy and the Daniels and Andrews fraudulent marriage. He was at the central core of all of this. Gable, his co-conspirator, testified that they had arranged approximately 10 to 15 sham marriages together. Alabi's role was to recruit the Nigerian nationals, and in turn Gable would find United States citizens to marry them. Alabi tutored her on how marriage fraud works, and she also learned from watching him what to do at the courthouse, how to stage the wedding pictures, and how to prepare for the immigration process. Alabi also paid Gable to take wedding pictures, and Gable said he was very smart because he would wait outside the courthouse, presumably so he would not be photographed, and he would not tell Gable how much money he made. She also testified that he was responsible for arranging the marriage between Daniels and Andrews, that he brought Daniel, a Nigerian national, to her house to meet Andrews, where they agreed to get married. And I disagree that her testimony was the only testimony here. Joseph, another co-conspirator, confirmed that Alabi arranged the fraudulent marriages and was paid. One time when she was over at her friend Gable's house, the phone rang. They went outside and met Alabi, and she saw Gable give him some money. And Gable had also told her that she wanted to take over the business, that she wanted to be able to find people for marriage so that they would call her instead of Alabi. One of the points that the defense counsel made in the brief is that he didn't have to, excuse me, that he wasn't involved with the documents and whatnot. But that doesn't matter. There's evidence here that he was involved in the front end. He was involved in arranging the marriages, and as Gable said, he actually was paid. And post-marriage actions aren't elements of the 1325 offense. They may be evidence in relation to what the intent was at the time or what have you, but this Court's been very clear on what the elements of the crime are. And the court, excuse me, the district court here charged that correctly. Also, nobody had to testify as defense counsel claims that Alabi knew the couple's intended to invade the marriage laws. As this Court well knows, conspiracy cases often rest on circumstantial evidence and reasonable inferences. And the jury here was the final arbiter of the credibility of these witnesses. And in relation to the jury instructions, the court very carefully considered Alabi's tender. Some of it was duplicative, as the court has pointed out, of what the district court actually submitted. But what was different, and if you'll look on, it's the record 17-20543, which is the Alabi record. On page 249, his proposal for marriage fraud is there. And what he wanted to attach to that is the defendant did not intend to establish a life together with the person he, she married. And for that, he quotes a First Circuit case and a Ninth Circuit case. But he also recognizes that's not the law in this circuit. The Ortiz-Mendez case, which this Court held in 2011 at 634 Fed 3rd 8837, rejected that very, very principle, as Judge Rosenthal noted when she said, no, that's clearly getting outside of the Fifth Circuit law. So here, the instruction substantially followed this Court's opinion in Ortiz. And a district court, of course, is not required to submit an incorrect instruction or one that's already been in the charge. And here, there's absolutely no evidence that Alabi's defense was compromised. And there is overwhelming evidence of his guilt. And unless the Court has any further questions, I'll yield the remainder of my time. Thank you, Ms. Wilson. Ms. Keller. The psychoactive substances condition is going to continue to percolate up to this Court. Just in my office alone, I have two other cases, appeals coming up with this issue. I understand there's no objection in this case. But one of the reasons for plain review is judicial integrity, fairness, and efficiency. One of the things this Court could do in this opinion is encourage district courts to modify that language for future usage. Include language like make it illegal psychoactive substance or psychoactive substance intended to mimic the effects of an illegal drug. That would take away the overbroad issue. That would take away the vagueness issue. Unless the Court has any further questions. Thank you.  Thank you, Ms. Keller. Ms. Rowe. May it please the Court. The standard of review in this case, as this Court has pointed out, is high, but it's not insurmountable. And there's plenty of cases out there that support the appellant's contention in this case. But keep in mind that if this Court acknowledges that the Owens factors have been met in this case, but still find that we have not met the specific and compelling prejudice prong, then it would be based on a showing of a constitutional right. Said another way, we have made a showing of a constitutional right which is the highest of high standards that could be presented to this Court, and it must meet the specific and compelling prejudice prong. Because if it doesn't, nothing ever will. For that reason, we ask this Court to reverse this judgment and remand for a separate trial so that Mr. Daniel can be given a fair trial, which he was denied in this case, and so that justice may be done. Thank you. Thank you, Ms. Rowe. Mr. Giselle. May it please the Court. I wanted to first respond to opposing counsel's argument about the jury instruction that Mr. Alabi cited a First Circuit decision in support of an instruction. We're not arguing that requested instruction on this appeal. That was a requested instruction. It was denied. But that's not the instruction we're raising here. The instruction that was requested and denied that we're raising here was that the parties had to intend to violate the — evade the immigration laws at the moment the marriage was entered into, and that is a correct statement of Fifth Circuit precedent under United States v. Ntgaga. And so we were not requesting an instruction that was supported by other circuit law. All right. Thank you, Mr. Giselle. Your case is under submission. The Court notices that Ms. Keller, Ms. Rowe, and Mr. Giselle are CJA appointments, and we appreciate your willingness to take the appointment on behalf of your client. Next case, United States v. Anderson.